# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

JUDY DRUMM,  :

            Plaintiff,

-vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,
            Defendant.  :

Case No. 3:09-cv-062

District Judge Walter Herbert Rice
Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

       Plaintiff brought this action pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1381(c)(3) as it incorporates §405(g), for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

       Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a directed verdict

(now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

To qualify for supplemental security benefits (SSI), a claimant must file an application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. §1381a. With respect to the present case, eligibility is dependent upon disability, income, and other financial

resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application. *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520 . First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 (1990). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed an application for SSD on August 12, 2004, and an application for SSI on October 22, 2004, alleging disability from April 15, 2004, due to a stroke, inflamed rotator cuff on her left shoulder, and a torn ACL on her left knee. *See* Tr. 57-59, 517-19; 101. Plaintiff's applications were denied initially and on reconsideration. *See* Tr. 39-48, 520-27. A hearing was held before Administrative Law Judge Melvin A. Padilla, (Tr. 532-57), who determined that Plaintiff is not disabled. (Tr. 18-33). The Appeals Council denied Plaintiff's request for review, (Tr. 7-10), and Judge Padilla's decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge Padilla found that Plaintiff has severe residuals of cervical surgery, residuals of right knee surgery, a history of transient ischemic attack-like episodes of undetermined etiology (the last one documented in 2004), an adjustment disorder with depressive and anxious features, and nicotine dependence, but that she does not have an impairment or combination of impairments that meets or equals the Listings. (Tr. 22, ¶ 3; Tr. 25, ¶ 4). Judge Padilla also found that Plaintiff has the residual functional capacity to perform a reduced range of light work. *Id.*, ¶ 5. Judge Padilla then used sections 202.14 and 202.15 of the Grid as a framework for deciding, coupled with a vocational expert's testimony, and found there is a significant number of jobs in the economy that Plaintiff is capable of performing. (Tr. 31-32, ¶ 10). Judge Padilla concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act. (Tr. 32, ¶11).

In her Statement of Errors, Plaintiff does not challenge the Commissioner's findings with respect to her alleged mental impairments. (Doc. 9). Accordingly, the Court will focus its review of the medical evidence on Plaintiff's alleged exertional impairments.

An MRI of Plaintiff's left knee performed on July 14, 2003, revealed a possible

4

partial tear of the anterior cruciate ligament as well as a tear involving the anterior horn of the lateral meniscus. (Tr. 160). Subsequently, Dr. Welker, an orthopedist, aspirated the fluid from Plaintiff's knee. (Tr. 161-65). On August, 18, 2003, Dr. Welker reported that Plaintiff was doing well, had a normal gait, normal ranges of motion, and that she had made a full recovery. *Id.*

Plaintiff was hospitalized April 15-19, 2004, after complaining of difficulty speaking and right sided weakness. (Tr. 166-85). A brain MRI revealed a small left anterior parietal infarct and an MRA was unremarkable. *Id.* An echocardiogram showed no evidence of embolic source and a bilateral carotid doppler study showed no evidence of stenosis. *Id.* Plaintiff was discharged in a significantly improved condition with no focal neurological deficits. *Id.*

Plaintiff was hospitalized again May 11-14, 2004, with similar complaints. (Tr. 186-95). A CAT scan of the brain showed no evidence of new infarction and an EEG was normal. *Id.* Plaintiff was discharged with the diagnosis of recurrent transient ischemic attacks and intracranial stenosis of a branch of the right middle cerebral artery territory. *Id.*

Plaintiff underwent a head and neck CT performed in June, 2004, which revealed unremarkable carotid bifurcations and patent vertebral arteries in her neck. (Tr. 198-99). The CT angiography of the intracranial vessels found no evidence of focal stenosis, branch occlusion, or aneurysm and a single enlarged submaxillary triangle lymph node on the left. *Id.*

Plaintiff was hospitalized July 7-9, 2004, after complaining of weakness and numbness on the right side and slurred speech. (Tr. 200-06). During that hospitalization, a CT of Plaintiff's brain was negative, a carotid duplex ultrasound showed a 20-40% stenosis of the right internal carotid artery, and an echocardiogram was unrevealing. *Id.* Plaintiff was discharged with the diagnoses of recurrent transient ischemic attack, intracranial stenosis in the right middle cerebral

artery, and possible reactive hypoglycemia. *Id.*

The record contains a copy of treating physician Dr. Snider's office noted dated July 19, 2004, to May 2, 2006. (Tr. 347-413). Those notes reveal that Dr. Snider treated Plaintiff for various medical conditions and complaints including history of CVA, increased lipids, anxiety/depression, hypertension, knee problems, and cervical spondylosis. *Id.*

On August 24, 2004, Dr. Snider reported that he had been treating Plaintiff since July, 2004, after three stroke-like episodes, that she had continued to have some weakness and neurologic symptoms, and that she subsequently continued to have episodes of recurrent neurologic symptoms. *Id.* Dr. Snider also reported that Plaintiff had some mild general problems with concentration and attention that were not overwhelming in nature, that she also had recent knee problems including right knee meniscal tear, and that she did reasonably well after knee surgery. *Id.* Dr. Snider noted that Plaintiff's main medical problems were a history of cerebral vascular accidents and alleged recurrent focal neurologic deficits of unclear etiology, history of anxiety and depression that is fairly to moderately well-controlled, hyperlipidemia, hypertension, and right knee meniscal tear. *Id.* Dr. Snider also noted that Plaintiff's limitations from the neurologic standpoint and the anxiety and depression would be mild to moderate, at most and would probably only minimally affect her ability to maintain a job, that based on her physical and mental conditions, she would be moderately affected as to her ability to work in a regular environment, and that she would probably be at least limited to part-time work. *Id.*

On February 10, 2005, Dr. Snider reported that Plaintiff was able to stand frequently and walk occasionally, could not squat, climb ladders, kneel, crawl, or use foot controls and that Plaintiff was able to work at the light exertional level. *Id.* Dr. Snider further reported that Plaintiff

6

could not perform fine manipulation with her right hand. *Id.* Dr. Snider based his opinion on Plaintiff's problems with coordination, confusion from her cerebral vascular accident, and her right knee meniscal tear. *Id.*

On May 3, 2005, Dr. Snider reported that Plaintiff was able to stand/walk for four hours in an eight-hour day and for one hour without interruption, that her ability to sit was not affected, and that she was able to lift/carry up to 25 pounds occasionally and 10 pounds frequently. *Id.* On October 21, 2005, Dr. Snider noted that Plaintiff's abilities to stand/walk, sit, and lift/carry were not affected by her impairments. *Id.*

Dr. Snider reported on March 8, 2006, that Plaintiff was able to stand/walk for three hours in an eight-hour day and for one hour without interruption, her ability to sit was not affected, and that she was able to lift/carry up to ten pounds occasionally and up to five pounds frequently. *Id.*

The record contains a copy of Plaintiff's treatment notes from neurologist Dr. Vandersluis dated August 19, 2004, through December 20, 2005. (Tr. 274-90). When Dr. Vandersluis first evaluated Plaintiff on August 19, 2004, he noted that her neurological examination was essentially normal and he determined that Plaintiff was having recurrent episodes of neurologic dysfunction on the background of the left MCA branch stenosis and infarct, that the events might have reflected hypoglycemia, reduction in blood pressure, recurrent infarcts, or seizure. *Id.* In April, 2005, Dr. Vandersluis noted that Plaintiff had reported another episode of right arm weakness, lightheadedness without headache, nausea, and fatigue. *Id.* Dr. Vandersluis opined that Plaintiff was status post left parietal stroke with MCA narrowing and recurrent episodes that were not fully explained. *Id.* An MRI of Plaintiff's cervical spine performed in October, 2005, revealed

7

degenerative changes at C5-C6 and C6-C7, including endplate bony spur formation, disc space narrowing, significant narrowing of the central canal, and bilateral neuroforaminal narrowing. *Id.* On December 6, 2005, Dr. Vandersluis noted that Plaintiff reported having pain radiating down her right arm with any use and right leg pain, that this occurs on the background of significant cervical degenerative disease, and that his assessment was cervical degenerative disease with a question of myelopathy. *Id.* Dr. Vandersluis reported on December 20, 2005, that Plaintiff was doing well overall without new numbness, weakness, or incoordination, and that she had experienced some relief with physical therapy. *Id.*

Plaintiff sought treatment from orthopedist Dr. Welker again in January, 2005, for complaints of pain in her right knee. (Tr. 262-67). Dr. Welker eventually performed knee arthroscopic surgery and on August 18, 2005, Dr. Welker noted that post-operatively Plaintiff did very well until about six weeks prior to the August, 2005, examination, when she noticed increased pain. *Id.* Dr. Welker injected Plaintiff' knee with Marcaine and Kenalog. *Id.*

Plaintiff consulted with neurosurgeon Dr. Africk on May 16, 2006, who noted that Plaintiff reported neck and bilateral arm pain, worse on the right, with numbness and tingling. (Tr. 414-15). Dr. Africk also noted that Plaintiff's examination revealed some weakness in the right biceps and the right external rotators, some hypoalgesia on the right and left in a nondermatomal pattern, a positive Hoffman's sign bilaterally, a negative Tinel's sign, and that Phalen's maneuver was positive on the right. *Id.* Dr. Africk identified Plaintiff's diagnoses as cervical spondylosis with herniated disk at C6-7. *Id.*

An MRI of Plaintiff's cervical spine performed on May 19, 2006, revealed degenerative changes at C4-5 that resulted in a moderate to severe degree of right neural foraminal

8

narrowing and more moderate left neural foraminal narrowing, a broad based disc protrusion indenting the ventral epidural space with mild compression of the cord at C5-6 and moderate narrowing of the left neural foramen and more severe narrowing of the right neural foramen. (Tr. 416-17). In addition, the MRI revealed a central and right paracentral disc protrusion at C6-7 resulting in mild central canal and bilateral neural foraminal narrowing. *Id.*

On July 7, 2006, Dr. Africk performed an anterior cervical diskectomy, osteophytectomy, and fusion at C5-6 and C6-7 and subsequently Plaintiff did well. (Tr. 418-28; 429-36). Dr. Africk reported on August 30, 2006, that Plaintiff should avoid working where it required her to constantly look up, avoid heavy lifting, and should avoid anything that jars the spine such as horseback riding and riding roller coasters. *Id.*

The records shows Plaintiff continued to treat with Dr. Snider through at least September, 2007. (Tr. 437-43, 466-68, 507-14). On August 30, 2007, Dr. Snider reported that Plaintiff's ongoing problems, including significant difficulty with concentration, memory and the ability to focus and follow directions, along with her physical limitations related to the orthopedic and cervical surgeries, would make it very difficult for her to maintain a thirty-hour work week. (Tr. 490).

In her Statement of Errors, Plaintiff alleges that the Commissioner's residual functional capacity finding is not supported by treating physician opinions. (Doc. 9). The thrust of Plaintiff's argument is that the Commissioner erred in evaluating Dr. Snider's opinion. *Id.*

In determining that Plaintiff is capable of performing a limited range of light work, Judge Padilla relied on a synthesis of the evidence submitted by the reviewing physicians, Dr. Africk's opinion, and Dr. Snider's assessments. (Tr. 25).

In assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards. *Blakley v. Commissioner of Social Security,* 581 F.3d 399 (6th Cir. 2009). One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because

> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone of from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Id.* at 406, *quoting*, *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544, (6th Cir. 2004), *quoting,* 20 C.F.R. § 404.1527(d)(2).

The ALJ "must" give a treating source opinion controlling weight if the treating source opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Blakley, supra, quoting, Wilson, supra.* On the other hand, a Social Security Ruling[1] explains that "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record." *Blakley, supra, quoting,* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is

---

[1] Of course, although Social Security Rulings do not have the same force and effect as statutes or regulations, "[t]hey are binding on all components of the Social Security Administration" and "represent precedent, final opinions and orders and statements of policy" upon which the agency relies in adjudicating cases. 20 C.F.R. § 402.35(b).

appropriate by considering a number of factors, including the length of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Blakley, supra, citing, Wilson, supra.* and 20 C.F.R. § 404.1527(d)(2).

Closely associated with the treating physician rule, the regulations require the ALJ to "always give good reasons in [the] notice of determination or decision for the weight" given to the claimant's treating source's opinion. *Blakley,* 581 F.3d at 406, *citing,* 20 C.F.R. §404.1527(d)(2). Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Blakley,* 581 F.3d at 406-07,*citing,* Soc.Sec.Rule 96-2p, 1996 WL 374188 at *5. The *Wilson* Court explained the two-fold purpose behind the procedural requirement:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. *Snell v. Apfel,* 177 F.3d 128, 134 (2nd Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Blakely,* 581 F.3d at 407*, citing, Wilson,* 378 F.3d at 544. Because the reason-giving requirement exists to ensure that each denied claimant received fair process, the Sixth Circuit has held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given "*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the

11

record." *Blakely, supra, quoting, Rogers v. Commissioner of Social Security.,* 486 F.3d 234, 253 (6th Cir. 2007)(emphasis in original).

In rejecting Dr. Snider's opinions that Plaintiff is "unemployable" and that she is capable of working only thirty hours a week, Judge Padilla noted that Dr. Snider's opinion was internally inconsistent and not supported by his objective findings. (Tr. 27).

On September 3, 2004, May 3, 2005, and March 6, 2006, Dr. Snider reported that Plaintiff was unemployable. (Tr. 398, 380, 351). However, in those same reports, Dr. Snider essentially opined that Plaintiff had the residual functional capacity to perform work-related activities anywhere from at least the sedentary level to the light level. *Id.* In addition, although Dr. Snider's opinion as to Plaintiff's residual functional capacity changed from time to time, he offered no objective clinical findings to support any of his opinions. *See*, *e.g.,* Tr. 398, 409, 380, 358, 351. Further, in contrast to his other opinions that Plaintiff was unemployable or limited in her abilities to perform work-related activities, in August 2007, Dr. Snider reported that Plaintiff would have only "some physical limitations related to the orthopedic and cervical surgeries." (Tr. 490).

Under these facts, the Commissioner was not required to give Dr. Snider's opinion controlling, or even great, weight.

As noted above, in determining Plaintiff's residual functional capacity, Judge Padilla relied on a synthesis of Dr. Snider's opinion, Dr. Africk's opinion, and the reviewing physicians' opinions. In doing so, Judge Padilla noted the reviewing physicians assessed Plaintiff's functional capabilities to perform light level work in November, 2004 and April, 2005, (Tr. 208-15), before Plaintiff's 2006 cervical fusion surgery and prior to the effects of Plaintiff's knee surgery being considered. (Tr. 25-26). However, Judge Padilla also noted that post-operative progress notes

submitted by Dr. Africk, were consistent with the ability to perform light level work after her neck surgery and that the right knee arthroscopic surgery was successful in resolving her complaints. *Id.* Those conclusions are supported by the record evidence. *See, e.g.,* Tr. 429-32; 263.

The regulations expressly provide that the responsibility for deciding a claimant's residual functional capacity rests with the Administrative Law Judge when cases are decided at an administrative hearing. *Webb v. Commissioner of Social Security,* 368 F.3d 629, 633 (6th Cir. 2004)(citations omitted); 20 C.F.R. § 404.1546; § 404.1527(e)(2). This Court concludes that the Commissioner did not err by relying on a synthesis of the medical evidence in determining that Plaintiff is not disabled.

Our duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits under the Act be affirmed.

February 19, 2010.

                                              *s/ Michael R. Merz*
                                              United States Magistrate Judge

# NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).